**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-18**

THOMAS ALEXANDER PORTER,

            Petitioner - Appellant,

        v.

DAVID ZOOK, Warden, Sussex I State Prison,

            Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  James R. Spencer, Senior District Judge.  (3:12-cv-00550-JRS)

Argued:  January 23, 2018                          Decided:  August 3, 2018

Before THACKER and HARRIS, Circuit Judges, SHEDD, Senior Circuit Judge.

Affirmed in part, vacated in part and remanded with instructions by published opinion.  Judge Thacker wrote the opinion, in which Judge Harris joined.  Judge Shedd wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant.  Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:** Dawn M. Davison, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia; Trey R. Kelleter, VANDEVENTER

BLACK, LLP, Norfolk, Virginia, for Appellant. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

THACKER, Circuit Judge:

This death penalty case is before us for the second time. In 2007 Thomas Alexander Porter ("Appellant") was convicted in Virginia state court of capital murder for killing a Norfolk law enforcement officer, Stanley Reaves. He was sentenced to death.

After he pursued direct and collateral review in state court, Appellant filed the operative 28 U.S.C. § 2254 petition in the district court, raising a host of challenges to his conviction and sentence. Chief among them was a claim that one of the jurors was biased against him. Specifically, when asked at voir dire whether any jurors had relatives in law enforcement, the juror did not disclose that his brother was a law enforcement officer in the jurisdiction adjacent to Norfolk.

The district court dismissed the § 2254 petition. *See Porter v. Davis*, No. 3:12-cv-550, 2014 WL 4182677, at *52 (E.D. Va. Aug. 21, 2014) ("*Porter I*"). Appellant filed a plenary appeal of that dismissal, and we dismissed the appeal and remanded for further consideration of Appellant's actual bias claim, which the district court failed to address in the first instance. *See Porter v. Zook*, 803 F.3d 694 (4th Cir. 2015) ("*Porter II*"). On remand, the district court dismissed Appellant's actual bias claim as a matter of law without holding an evidentiary hearing. *See Porter v. Zook*, No. 3:12-cv-550, 2016 WL 1688765, at *1 (E.D. Va. Apr. 25, 2016) ("*Porter III*"). We now consider an appeal of that decision and the dismissal of his other claims.

Although we affirm on the majority of Appellant's claims, we are constrained to remand once again on the juror bias issue. In dismissing the actual bias claim, the district

3

court failed to recognize the applicability of Supreme Court precedent requiring a hearing in these circumstances; erected inappropriate legal barriers and faulted Appellant for not overcoming them; and ignored "judicially-recognized factors" in determining whether a hearing is necessary. *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012). We likewise conclude that the district court erred in *Porter I* by dismissing Appellant's separate but related juror bias claim brought pursuant to *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).

We therefore affirm in part, vacate in part, and remand with instructions that the district court allow discovery and hold an evidentiary hearing on Appellant's two separate juror bias claims.

## I.

## A.

In Virginia state court on March 7, 2007, Appellant was convicted of using a firearm in the commission of a felony, grand larceny of a firearm, and capital murder for killing a law enforcement officer in order to interfere with the performance of his official duties.[1] The following facts were adduced at Appellant's trial:

> At approximately 3:30 p.m. on October 28, 2005, Porter and Reginald Copeland traveled in Porter's Jeep to the Park Place apartment complex located at 2715 DeBree Avenue in the City of Norfolk to inquire about purchasing marijuana. Porter

---

[1] Virginia law provides that an individual is guilty of capital murder if he is convicted of "[t]he willful, deliberate, and premeditated killing of a law-enforcement officer . . . , when such killing is for the purpose of interfering with the performance of his official duties." Va. Code Ann. § 18.2-31.6.

was carrying a concealed, nine-millimeter Jennings semi-automatic pistol. The two men entered the apartment of Valorie Arrington, where several people were present, including Valorie and her daughters, Latoria and Latifa . . . .

Once inside, Porter began arguing with the women, brandishing his gun, and threatening that he might shoot one of them if provoked. Copeland left the residence, but Porter remained behind, locking the door so Copeland could not reenter. After being locked out of Valorie's apartment, Copeland walked away from the apartment complex and happened upon three uniformed police officers a block away, including Norfolk Police Officer Stanley Reaves. Copeland reported Porter's behavior to Officer Reaves and directed him to Valorie's apartment.

Officer Reaves drove his police cruiser to the front curb of the apartment building, parked the car, and walked across the grass towards the sidewalk leading from the street to the apartment door. As Officer Reaves approached the apartment, Porter left Valorie's apartment and began walking away. Officer Reaves confronted Porter, grabbed Porter's left arm, and instructed him to take his hands out of his pockets. Porter then drew his concealed weapon from his pocket and fired three times, killing Officer Reaves. Porter took Officer Reaves' service pistol and then fled in his Jeep.

Several eyewitnesses, along with Porter, testified at trial and provided various descriptions of the events leading up to and immediately following Officer Reaves' death. . . .

Copeland testified that he and Porter entered Valorie's apartment because she was Copeland's friend and because he had smoked marijuana with her before. . . . [A]t some point in the conversation Porter began arguing with one of the women.

Copeland "didn't know what to do" but left the apartment and "ran down [to the next block] and told [Officer Reaves, ']Look, there is a man up in the house with some girls, and he shouldn't be in there.'" Copeland described the apartment building to Officer Reaves, and Officer Reaves drove his patrol car to the building with Copeland "running behind" the

vehicle. Officer Reaves arrived at the building before Copeland, and as Copeland approached he saw "Officer Reaves in the car and Porter was coming out [of] the building." Copeland identified Porter to Officer Reaves, and Officer Reaves instructed Copeland to stay back and then approached Porter. Moments later, Porter and Officer Reaves disappeared from Copeland's viewpoint behind a parked van, but Copeland "heard gunshots and started running," and he "ran and told the [other] officers what happened."

. . .

Simone Coleman testified that she was walking on the sidewalk near the apartment complex when she saw Officer Reaves' patrol car arrive. Coleman watched as Officer Reaves stepped out of his patrol car, and she saw Porter walking across the grass from the apartment, coming to "within a few feet" of her. She testified that Porter's hands were "[i]n his pockets" as Coleman passed by, and she "was looking back" to watch the confrontation between Officer Reaves and Porter. Coleman heard Officer Reaves instruct Porter to "take his hands out of his pockets," and then Officer Reaves "grabbed Mr. Porter's left arm." Coleman testified that Officer Reaves "didn't have a gun out," and that Porter, in response to Officer Reaves grabbing his arm, pulled a gun out of his pocket, pointed the gun at Officer Reaves' head, and pulled the trigger. Coleman watched Officer Reaves collapse to the ground, and she testified that Porter then shot Officer Reaves two more times. Coleman identified Porter in court as the man who killed Officer Reaves.

Selethia Anderson, who lived across the street from the apartment complex, was sitting on her front porch when she saw Officer Reaves arrive. Anderson testified that she watched Officer Reaves exit his vehicle and walk towards Porter as Porter was leaving the apartment complex. She described how Officer Reaves confronted Porter and "used his right hand to grab [Porter's] left hand," and then Porter immediately reached into his hoodie pocket with his right hand, pulled out a gun, and shot Officer Reaves in the head. Anderson testified that after Officer Reaves fell, Porter shot him twice more "between the back of the head and neck." According to Anderson, Porter knelt over Officer Reaves'

6

body after the shooting, and when Porter left the scene, he was carrying a "bigger gun" than the one he had used to shoot Officer Reaves. Anderson identified Porter in court as the man who shot Officer Reaves.

Valorie testified that she was in her apartment that afternoon when Copeland arrived with Porter. According to Valorie, the two men "came for some marijuana" but the women did not have any, and asked the men to leave. Copeland agreed to leave, but Porter stayed inside, locked the door and kept Copeland outside. Valorie testified that she felt scared because Porter had "locked us in our own house." Valorie asked Porter why his hands were in his sweatshirt pocket, and Porter responded by pulling out his gun and asking, "[s]o are you going to give me the bag of weed or what?" Valorie testified that she uttered a prayer, and when Porter realized she was a Muslim, he told the women that they were "lucky" and he put away the gun. When Porter realized a police car had arrived, he left the apartment and ran "like some horses going down the stairs." Moments later, Valorie heard gunshots.

Latoria's testimony confirmed that Porter entered Valorie's apartment along with Copeland, and that Copeland left the apartment but Porter remained inside, locking the door. Latoria testified that Porter threatened that he would "get to clapping" if any of the women made a sudden move, and she explained that "clapping" was a term for "shooting." She testified that she looked out the window, noticed Officer Reaves arrive in his patrol car, and asked, "Why is Reggie [Copeland] talking to the police officer?" Latoria testified that Porter then immediately exited the apartment, and she watched through the window as Officer Reaves approached Porter, grabbed Porter's arm, and then Porter "reach[ed] into his right pocket and he pull[ed] out his gun and he shot him." Latoria testified that Officer Reaves did not have a weapon drawn when Porter shot him.

. . .

After killing Officer Reaves, Porter traveled to New York City where he was apprehended one month later in White Plains, New York. The murder weapon was found in his

7

possession at the time of his arrest. Officer Reaves' gun was eventually located in Yonkers, New York.

The autopsy report revealed that Officer Reaves suffered three close-range wounds to his head: one to the forehead, one to the left back of the head, and a flesh wound near the right ear. "The cause of death was two separate close range gunshot wounds to the head."

Porter did not dispute that he shot Officer Reaves, but his version of the events differed from that of the eyewitnesses. Porter testified in his own defense that he drove to Valorie's apartment with Copeland "[t]o get a bag of marijuana" because Copeland was his "means of getting marijuana." Porter parked the vehicle outside the apartment, and he "grabbed the gun out of the glove compartment box" before leaving the vehicle "[b]ecause the area . . . is a bad area." Porter testified that he gave Copeland $10 to purchase marijuana, and that he waited outside while Copeland went inside to make the purchase.

Porter testified that after a few minutes had passed, Copeland emerged from an upstairs apartment and invited him inside. Porter confirmed that Copeland left the apartment, but Porter denied locking the door and keeping Copeland outside. Porter also denied brandishing his gun inside the apartment or making a statement about shooting any of the women. Porter claimed that he left the apartment when he learned from the women that Copeland had not paid them for marijuana, and he denied that any of the women knew about Officer Reaves' arrival because "[w]asn't nobody even looking out the window."

Porter testified that he left the apartment and was walking to his vehicle "when Officer Reaves stepped in front of me and grabbed me." Porter and his counsel then had the following exchange:

> Q. Did anything else happen when he did that?
>
> A. Yes. I seen him pulling his gun.

8

Q. What do you mean, you saw him pulling his gun?

A. Well, when he grabbed me with his left arm on my left arm, we were still standing face to face. I seen him pulling his gun. That's when I put my hands up in the air and backed up, looking at him, like, "What [are] you doing?"

Q. You just described that you put your hands up in the air?

A. Yes.

Q. And at that point, what happened?

A. Well, I got my hands in the air when he finally gets the gun out and point it at me. I take my hands down and pull my gun and started shooting.

Q. Why did you do that, Mr. Porter?

A. Because I was scared. I thought he was going to kill me because he looked angry at the time, so I was just worried for my safety.

Porter testified on direct examination that he could not remember how many times he pulled the trigger, but after he shot Officer Reaves, he bent down, picked up Officer Reaves' gun and ran. Porter explained that he left the scene because he "was scared" because he realized he "just killed an officer."

Porter testified repeatedly on cross-examination that he "never wanted to kill anybody" but he also admitted that he "pulled out the gun" and "shot [Officer Reaves] in the forehead." Porter and opposing counsel had this exchange on cross-examination:

Q. You meant to hit Stanley Reaves with a bullet, didn't you?

9

A. Yes, sir.

Q. All right. And you took aim -- therefore, you took aim at him, correct?

A. Yes, sir.

Q. You took aim at a part of his body, correct?

A. Yes, sir.

Q. And the part of his body that you took aim at and then before pulling the trigger from less than six inches away was directly into his forehead, correct?

A. Yes, sir.

 . . . .

Q. And you agree that you knew you were aiming at his head, correct?

A. Yes, sir.

Porter also had this exchange on cross-examination:

Q. You admit that you . . . pulled your gun out?

A. Yes, sir.

Q. And that you shot him in the head?

A. Yes, sir.

Q. You admit that you stole his gun?

A. Yes, sir.

Q. So according to your version of events, you claim that Officer Reaves pulled his gun, correct?

10

A. Yes.

Q. And the only thing about the crime that's alleged you committed, the capital murder of Officer Stanley Reaves, using a gun to commit that murder and stealing Officer Reaves' gun, the only part of the crime that we're here that you're on trial for that you dispute, really, is the reason why you shot Officer Reaves; is that correct?

A. Yes.

*Porter v. Commonwealth of Va.*, 661 S.E.2d 415, 419–23 (Va. 2008). On March 14, 2007, a jury assigned the death penalty after finding there was a probability that Appellant "would commit criminal acts of violence that would constitute a continuing serious threat to society." J.A. 1579[2] (quoting Va. Code Ann. § 19.2-264.2).[3] Appellant received terms of imprisonment totaling 22 years on the remaining convictions.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] The entire statute provides:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

(Continued)

The Virginia Supreme Court affirmed Appellant's conviction and death sentence on June 6, 2008, *see Porter*, 661 S.E.2d at 419, and the United States Supreme Court denied certiorari, *see Porter v. Virginia*, 556 U.S. 1189 (2009). Appellant then filed a state habeas petition on August 10, 2009, attacking his conviction on the following grounds: (1) juror bias; (2) the Commonwealth failed to disclose exculpatory information, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and presented false testimony or allowed it to go uncorrected in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972); (3) trial counsel rendered ineffective assistance in numerous ways; and (4) the trial judge was biased against Appellant based on his former career as a prosecutor. *See Porter v. Warden*, 722 S.E.2d 534, 538–50 (Va. 2012). The Supreme Court of Virginia rejected his arguments and dismissed his habeas petition. *See id.* at 550.

On July 30, 2012, the district court granted Appellant's motion for stay of execution and entered a briefing schedule, directing Appellant to file his federal habeas petition within 70 days. On October 9, 2012, Appellant filed a federal habeas petition and on May 10, 2013, he amended his petition to add defaulted claims pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (2012) (holding that the ineffective assistance of initial post-conviction review counsel may establish cause for defaulting an ineffective

Va. Code Ann. § 19.2-264.2.

12

assistance of trial counsel claim).  *See* J.A. 2515–2618 ("Amended Petition").  The claims in the Amended Petition are as follows:

> **Claim I:** Juror Misconduct Violated Porter's Right to an Impartial Jury and to Due Process
>
> **Claim II:** The Prosecution Violated *Brady* Regarding Reaves's History of Unprofessional Conduct
>
> **Claim III:** The Prosecution Violated *Brady* and *Napue* Regarding Selethia Anderson
>
> **Claim IV:** Counsel Unreasonably Failed To Have Reaves's Holster Examined For Fingerprints
>
> **Claim V:** Trial Counsel Unreasonably Failed to Call Powerful Exculpatory Testimony to the Jury's Attention in Closing
>
> **Claim VI:** Counsel Unreasonably Failed to Obtain a Jury Instruction on First-Degree Murder
>
> **Claim VII:** Trial Counsel Failed to Investigate Reaves's History of Unprofessional Conduct
>
> **Claim VIII:** Counsel Failed to Conduct an Adequate Investigation into Porter's Chaotic and Abusive Childhood and Failed to Present the Evidence They Had Uncovered
>
> **Claim IX:** Counsel Failed to Reasonably Investigate the Prosecution's Aggravating Evidence
>
> **Claim X:** Counsel Failed to Investigate and Present Evidence of Porter's Correctional Experiences
>
> **Claim XI:** The State Court Violated Porter's Rights Under the 8th and 14th Amendments by Denying Porter the Assistance of a Risk Assessment Expert
>
> Defaulted Claims:

**Claim XII:** The Prosecution Withheld Material Evidence Impeaching a Penalty-Phase Witness

**Claim XIII:** Counsel Unreasonably Failed to Protect Porter's Constitutional Right to Testify

**Claim XIV:** Counsel Unreasonably Failed to Assert that His Proposed Risk Assessment Would Be of the Same Nature as that Contained in his Expert's Declaration

**Claim XV:** Counsel Unreasonably Failed to Object to Improper "Curative" Instructions and Comments by the Trial Court during his Closing that Denied Porter a Fair Sentencing

**Claim XVI:** Counsel Failed to Adequately Investigate the Shooting of Officer Reaves

**Claim XVII:** The Prosecution Withheld Material Evidence Impeaching a Guilt-Phase Witness

J.A. 2516–17.

The Warden filed a motion to dismiss on June 3, 2013, and the district court granted the motion on August 21, 2014, but it also issued a certificate of appealability "regarding all claims." *Porter I*, 2014 WL 4182677, at *52.

B.

We now turn to the specific factual and procedural background of Appellant's Claim I, the juror bias claim.

1.

During voir dire, the state trial court sitting in Arlington told the prospective jurors that Appellant's trial would "involve[] a charge of capital murder" of a "Norfolk police officer," J.A. 223, 227, and the case was moved from Norfolk because "we've had some publicity and wanted to try to select jurors who have not seen or heard any substantial

14

information about the case," *id*. at 222.  Defense counsel later asked the jury panel, "Have you, any member of your family or close personal friend worked for or with any law enforcement organization, either as an employee or on a volunteer basis?"  *Id*. at 250–51.  Juror Bruce Treakle responded, "My nephew is an Arlington County police officer."  *Id.* at 251.  He said this relationship would not affect his ability to be impartial.  He said nothing further.  Juror Treakle was ultimately selected to sit on the jury that convicted Appellant and sentenced him to death.

On May 30, 2009, after Appellant's direct appeal, state habeas counsel Maryl Sattler interviewed Juror Treakle.  Sattler, a law student at the time, produced an affidavit memorializing her interview.  *See* J.A. 1718–20 (the "Sattler Affidavit").[4]  According to the Sattler Affidavit, Juror Treakle said that sitting through Officer Reaves's wife's testimony at trial "had been difficult for him."  *Id*. at 1719.  He explained that Officer Reaves's wife's testimony was "moving" and "very emotional" for him "because [Juror Treakle's] brother is a sheriff's officer" in the Norfolk area.  *Id*.  He also "expressed sympathy for law enforcement officers."  *Id*.

2.

Upon discovering this information, Appellant alleged in his state habeas petition that his rights to an impartial jury and due process were violated "by the participation of a juror who concealed during voir dire that his brother," like Officer Reaves, "was a veteran law enforcement officer."  J.A. 1651.  Appellant also alleged that Juror Treakle's

_____

[4] Sattler worked on this case during her internship with the Virginia Capital Representation Resource Center.

brother worked in Chesapeake, the jurisdiction adjacent to Norfolk. Officer Reaves and his family also lived in Chesapeake, and at the time of Officer Reaves's murder, community members were mourning the death of another officer similarly killed in the line of duty. And significantly, after Officer Reaves's murder, Chesapeake and Norfolk law enforcement officers joined in a manhunt for Appellant. Indeed, Officer Reaves's wife wrote a letter in the local newspaper thanking the Chesapeake Police Department for its support in the aftermath of her husband's death.

Appellant raised three theories of juror bias in the state habeas petition based on these allegations: (1) actual bias; (2) implied bias;[5] and (3) juror silence foreclosing counsel's ability to conduct an adequate voir dire pursuant to *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984). The state habeas court dismissed the claim, explaining:

> In determining whether to grant a new trial based on an allegation that a juror was dishonest during voir dire, this Court applies the two-part test enunciated in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), which states that
>
>> to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

---

[5] Appellant did not raise an implied bias claim in his federal petition.

16

*Id.* at 556.

. . .

> The record demonstrates that Juror T[reakle] answered truthfully that he had a nephew who was an Arlington County Police Officer, Arlington County being the jurisdiction where the case was being tried following a change of venue, and that he was not asked, nor did he have the opportunity to answer, if he had any additional relationships with law enforcement officers. Thus, petitioner has failed to demonstrate that Juror T[reakle] failed to answer honestly a material question during voir dire.

*Porter v. Warden*, 722 S.E.2d 534, 539 (Va. 2012) (some citations omitted). By this analysis, the state habeas court addressed Appellant's *McDonough* juror bias claim, but it failed to address Appellant's actual bias claim.

In the Amended Petition, Appellant raised both an actual bias claim and a *McDonough* claim. In dismissing that petition, the district court likewise failed to address actual bias, but it did reject the *McDonough* claim, stating:

> It is clear that Juror Treakle did not volunteer false information. The main question of import is whether Juror T[reakle]'s omission of an additional family member that was a law enforcement officer amounted to a "material omission." *McDonough* provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask.

. . .

> It may be true that officers from the Chesapeake Sherriff's Office were more involved in his case than officers in Arlington County. However, [Appellant] presents only circumstantial evidence of bias, and a showing of implied bias is a very high bar.

17

*Porter I*, 2014 WL 4182677 at \*11 (internal quotation marks omitted). The district court

also denied Appellant's request for an evidentiary hearing as unnecessary.

Appellant appealed the dismissal of his § 2254 petition. We dismissed the appeal

on October 20, 2015, because the district court failed to address and resolve Appellant's

actual bias claim, and therefore, we did not possess jurisdiction. *See Porter II*, 803 F.3d

at 695. Specifically, we explained:

> [T]he district court dismissed [Appellant]'s petition without
> ruling on or seeming to recognize [Appellant]'s actual bias
> claim. Instead, the portion of the court's opinion devoted to
> juror bias addresses only the *McDonough* test for juror
> misconduct during voir dire . . . . It does not acknowledge a
> distinct actual bias claim, and it never passes on a central
> component of that claim: the law-student affidavit that has
> Treakle drawing a connection between his relationship with
> his brother and his response to certain trial testimony.

*Id*. at 698–99. We remanded the case "so that [the district court] can decide [Appellant]'s

actual bias claim," and instructed that "the district court may consider any argument or

defense properly raised by [Appellant] or the Warden, and may conduct an evidentiary

hearing or any other proceedings it deems necessary to resolve the claim." *Id.* at 699.

On remand, the district court ordered further briefing on the actual bias issue.

After briefing, it dismissed the actual bias claim without an evidentiary hearing on April

25, 2016, reasoning:

> (1) that [Appellant] exhausted his actual bias claim by fairly
> presenting the same to the Supreme Court of Virginia; (2) that
> the Supreme Court of Virginia decided the merits of the
> actual bias claim; and, (3) that under either the deferential
> standard set forth in 28 U.S.C. § 2254(d)(1)–(2), or a de novo

18

> standard of review, the actual bias claim lacks merit and may
> be dismissed without conducting an evidentiary hearing.

*Porter III*, No. 3:12-cv-550, 2016 WL 1688765, at *1 (E.D. Va. Apr. 25, 2016) (footnote

omitted).  The district court denied Appellant's motion to alter or amend the judgment,

and denied a certificate of appealability ("COA") on this issue on September 22, 2016.

But this court granted Appellant's request to expand his original COA to include the

actual bias claim, and this appeal followed.

Because we have yet to rule on the remaining non-juror claims, and because we

did not remand those claims to the district court in *Porter II*, we retain jurisdiction and in

the interest of expediency, see fit to address them at this juncture.

II.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

we generally apply a highly deferential standard of review to federal habeas petitions

challenging state court decisions:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  However, "where a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo."  *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) (footnote omitted).  We also review for abuse of discretion a district court's failure to conduct an evidentiary hearing or to authorize discovery in a § 2254 proceeding.  *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006).

## III.

### *Juror Claims*

Appellant's § 2254 petition raises two juror claims: actual bias and bias based on *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).  The two are "distinct" because "while a *McDonough* claim requires a showing of juror misconduct, an actual bias claim may succeed 'regardless of whether the juror was truthful or deceitful.'" *Porter II*, 803 F.3d 694, 698 (4th Cir. 2015) (quoting *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002)).  We address these claims in turn.

### A.

### *The Actual Bias Claim*

### 1.

### *Was the State Habeas Court Decision "On the Merits"?*

As explained above, whether the state habeas court adjudicated the actual bias claim on the merits dictates our standard of review.  Thus, we turn to that question first.

The district court stated that the state habeas court "did not address whether Bruce Treakle was actually biased in connection with the juror bias claim."  J.A. 2942.

20

However, it nonetheless concluded that the state habeas court adjudicated the actual bias claim on the merits by addressing the issue in the wholly distinct context of Appellant's ineffective assistance of counsel ("IAC") claim. In the state habeas court, Appellant claimed that trial and appellate counsel were ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), because they failed to raise the issue that Treakle "was biased due to his brother's employment as a law enforcement officer." *Porter*, 722 S.E.2d at 549. In disposing of this IAC claim, the state habeas court stated:

> [The IAC claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript and [an] affidavit of counsel, demonstrates that counsel did not know that Juror T[reakle] had a brother in law enforcement. More importantly, [Appellant] has provided no admissible evidence that Juror T[reakle] was biased against [Appellant] as a result of his brother's employment.

*Id.* The district court cited to this passage and explained, "Specifically, the Supreme Court of Virginia adjudicated the merits of [Appellant]'s actual bias claim when it found that '[Appellant] has provided no admissible evidence that Juror T[reakle] was biased against [Appellant] as a result of his brother's employment.'" *Porter III*, 2016 WL 1688765, at \*7 (quoting *Porter*, 722 S.E.2d at 549). We find this conclusion to be erroneous. The state court's disposition on Appellant's IAC claim was not an adjudication on the merits of his *separate* actual bias claim.

a.

To begin, IAC claims are subject to a substantially different -- and more demanding -- standard of proof than actual bias claims. In order to demonstrate

21

ineffective assistance of counsel in a habeas proceeding under *Strickland*, a petitioner must demonstrate first, "counsel's performance was deficient," and second, "the deficient performance prejudiced the defense." 466 U.S. at 687. Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In contrast, on the merits of an actual bias claim, Appellant must prove that a juror, because of his or her partiality or bias, was not "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Thus, what a petitioner must prove to succeed in a *Strickland* claim -- that not only did counsel make grave errors, but that those errors affected the outcome of the proceedings -- is a much higher bar that what he must prove on an actual bias claim.

Moreover, the *Strickland* inquiry focuses on counsel's representation measured against established professional norms, but the actual bias inquiry focuses on a juror's lack of partiality, for which "the Constitution lays down no particular tests and procedure." *Frazier v. United States*, 335 U.S. 497, 511 (1948). Supreme Court case law contemplates further fact finding once sufficient allegations of juror bias have been made, whereas *Strickland* claims are generally based on a concluded and comprehensive record. And at this juncture Appellant is, at base, requesting discovery and an evidentiary hearing on his allegations of juror partiality -- an even lower bar than proving a juror was actually biased against him. As explained further below, Appellant need only demonstrate that he

22

diligently pursued his actual bias claim in state court; his allegations, if true, could entitle him to relief; and he fulfills at least one of six factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *See Juniper v. Zook*, 876 F.3d 551, 563 (4th Cir. 2017). We thus decline the invitation to conflate the IAC and actual bias standards for purposes of § 2254(d).[6]

b.

In concluding that the actual bias claim was adjudicated on the merits, the district court relied on *Sturgeon v. Chandler*, 552 F.3d 604, 612 (7th Cir. 2009), and *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007). *Sturgeon* held that where a state court evaluated a defendant's right to a competency hearing in the context of an IAC claim, rather than a stand-alone claim, "the merits were effectively reached" because "[t]he court could not have decided the same . . . question any differently" in the context of the stand-alone

---

[6] To the extent the State relies on the state habeas court's and district court's view that there was no "admissible" evidence demonstrating bias, this view is legally erroneous. The Virginia Supreme Court has held that inadmissible evidence is nonetheless "sufficient to require the court to hold a hearing" on a juror bias issue. *Kearns v. Hall*, 91 S.E.2d 648, 652–53 (Va. 1956). The Virginia court explained, "When allegations of the misconduct of a jury are of such a nature as to indicate that the verdict was affected thereby, it becomes the duty of the court to investigate the charges and to ascertain whether or not, as a matter of fact, the jury was guilty of such misconduct." *Id.* at 653. In any event, one can conceive of admissible purposes for which the Sattler Affidavit and other out of court statements may be offered, such as to demonstrate not that Juror Treakle's brother was actually in a law enforcement position, but that Juror Treakle had knowledge of that fact at the time of voir dire. *See In re C.R. Bard, Inc.*, 810 F.3d 913, 926 (4th Cir. 2016) ("A statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than its truth, and this includes statements used to charge a party with knowledge of certain information."). This, of course, may be taken up in the district court on remand.

23

claim. 552 F.3d at 612. But the state court in this case *could have* concluded that Appellant produced evidence of actual bias sufficient for a hearing, while still deciding that no evidence of bias existed at the time of trial or appeal to support a claim that trial counsel acted unreasonably. In fact, one of the state habeas court's reasons for denying the *Strickland* claim was that trial counsel did not know at the time of trial that Juror Treakle had a brother in law enforcement. This conclusion certainly does not preclude a finding that an actual bias hearing is warranted.

Similarly, in *Albrecht*, the Third Circuit reasoned that the state habeas court addressed a claim that jury instructions were ambiguous "on the merits" in a related IAC claim. 485 F.3d at 116. That court explained, "The state Supreme Court identified the correct governing legal principle, and then purported to apply it, which constitutes an adjudication on the merits sufficient for purposes of the statute." *Id.* (citation omitted). But here, the state habeas court *did not* recognize the governing legal principle with regard to the actual bias claim, especially Appellant's requests for an evidentiary hearing on that claim. *See Smith*, 455 U.S. at 215 (The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). In fact, the state habeas court failed to even recognize that Appellant lodged an actual bias claim separate from his *McDonough* claim.

Thus, *Sturgeon* and *Albrecht* are not only nonbinding, they are also inapposite, and we decline to follow them. For these reasons, we hold that Appellant's actual bias claim was not heard "on the merits." As such, this court and the district court are not bound by the deference afforded in § 2254(d), but rather, may conduct our review of the actual bias

24

issue de novo.  *See Monroe*, 323 F.3d at 297.

2.

*The District Court's Dismissal of the Actual Bias Claim*

Employing a de novo standard of review, we hold that the district court erred in dismissing the actual bias claim as a matter of law without conducting discovery and holding an evidentiary hearing.  We recognize that in our remand to the district court in *Porter II*, we stated the district court "*may* conduct an evidentiary hearing or any other proceedings it deems necessary to resolve the claim."   803 F.3d at 699 (emphasis supplied).    Nonetheless, in reviewing anew the district court's latest decision, we conclude that its reasoning for dismissing the actual bias claim without an evidentiary hearing is contrary to law.  First, the district court failed to appreciate that this case is controlled by *Williams v. Taylor*, in which the Supreme Court held that a hearing was warranted.  Second, it held Appellant to unreasonable standards.  Third, it misinterpreted the effect of Federal Rule of Evidence 606(b).  And finally, it failed to apply the proper analysis to Appellant's hearing request.

a.

"[T]he Sixth Amendment, made applicable to the states through the Fourteenth Amendment, requires that a state provide an impartial jury in all criminal prosecutions." *Jones*, 311 F.3d at 310 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  "If 'even one partial juror is empaneled' and the death sentence is imposed, 'the State is disentitled to execute the sentence.'"  *Id*. (alteration omitted) (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)).  The Supreme Court "has long held that the remedy for allegations of juror

25

partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith*, 455 U.S. at 215; *see also id*. at 222 (O'Connor, J., concurring) ("[I]n most instances a postconviction hearing will be adequate to determine whether a juror is biased."). And "[p]reservation of the *opportunity* to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis v. United States*, 339 U.S. 162, 171–72 (1950) (emphasis supplied).

Nonetheless, "[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Smith*, 455 U.S. at 221–22 (O'Connor, J., concurring). "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *Frazier*, 335 U.S. at 511. To be sure, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith*, 455 U.S. at 217. Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id*. Again, this determination "may properly be made at a hearing." *Id*. (citing *Remmer v. United States*, 347 U.S. 227 (1954)).

A court is not, however, "obliged to hold an evidentiary hearing any time that a defendant alleges juror bias." *Billings v. Polk*, 441 F.3d 238, 245 (4th Cir. 2006). But in determining that a hearing was not warranted here, the district court failed to recognize

26

the applicability of a significant actual bias decision, *Williams v. Taylor*, 529 U.S. 420 (2000). In *Williams*, the Supreme Court addressed a claim of bias where a juror, when asked if she was related to anyone on the witness list and where her ex-husband was listed as a witness, remained silent, "indicating the answer was 'no.'" 529 U.S. at 440. Then, when asked if she had ever been represented by any of the attorneys involved in the case, she said nothing, even though she had been represented by the prosecutor during her divorce. *See id.* at 440–41.

The Court reasoned that even though the juror may not have been technically "related" to her ex-husband at the time of the trial, "her silence . . . could suggest to the finder of fact an unwillingness to be forthcoming; this in turn could bear on the veracity of her explanation for not disclosing that [the prosecutor] had been her attorney." *Williams*, 529 U.S. at 441. The Court characterized the juror's silence on the second question to be "misleading as a matter of fact," and coupled with the prosecutor's failure to speak up, the omissions as a whole "disclose[d] the need for an evidentiary hearing." *Id*. at 442. At such a hearing, the Court explained, the petitioner "could establish that [the juror] was not impartial." *Id*.

This case falls squarely within the confines of *Williams*. Juror Treakle remained silent regarding the fact that his brother was a law enforcement officer, in the neighboring jurisdiction no less. In addition, Juror Treakle told counsel after the verdict that he felt "sympathy for law enforcement officers" and found Mrs. Reaves's testimony "moving" and "very emotional" *because* of the fact that he had a brother who worked as a law enforcement officer. J.A. 1719. Mrs. Reaves was the State's first witness. Her

27

testimony set the tone for the entire trial. Moreover, the jury venire was told that the victim was a law enforcement officer and that the case originated in Norfolk. To withhold information that one's brother was an officer in the adjacent jurisdiction certainly "suggest[s] . . . an unwillingness to be forthcoming," and at the very least, "disclose[s] the need for an evidentiary hearing." *Williams*, 529 U.S. at 441–42. The district court failed to recognize the applicability of *Williams* and therefore erred in dismissing Appellant's actual bias claim as a matter of law without a hearing.

### b.

The district court also erred by erecting three legal hurdles out of whole cloth and then faulting Appellant for not overcoming them: (1) it placed an insurmountable burden on counsel conducting voir dire; (2) it held Appellant to an evidentiary standard that is both unwarranted and scarcely possible without the chance for discovery; and (3) it made assumptions adverse to Appellant about Juror Treakle's answers without the benefit of Juror Treakle's in-court testimony.

### i.

First, the district court stated, "[C]ounsel . . . did not ask Treakle . . . to identify *every* member of his family who had a connection to law enforcement" and "did not engage in any searching scrutiny of how each individual law enforcement relationship may play out with respect to the particular evidence to be introduced." *Porter III*, 2016 WL 1688765, at *11 (emphasis supplied). And it categorized counsel's voir dire as seeking merely "a general assurance . . . that [one's] connection to law enforcement personnel would not impair his or her ability to remain impartial." *Id*.

28

This analysis is erroneous. Counsel specifically asked, "Ha[s] . . . any member of your family . . . worked for any law enforcement organization" as "an employee"? *Id*. at *2. We have held that if a juror is asked a specific question which encompasses two answers, a juror "fail[s] to answer honestly a material question on voir dire" if he only mentions one of them. *Conaway v. Polk*, 453 F.3d 567, 585 (4th Cir. 2006). Moreover, the district court places a burden on trial counsel uncontemplated by the Supreme Court or this court -- that counsel must keep asking questions until the juror gives a complete answer, without knowing whether the answer is complete. Indeed, counsel had no opportunity to ask whether Juror Treakle could be impartial even though his *brother* was an officer *in the jurisdiction adjacent to the scene of the crime*. In other words, defense counsel had no chance to "engage in any searching scrutiny" of Juror Treakle's relationship with his brother because he did not know about it. *Porter III*, 2016 WL 1688765, at *11. Counsel is entitled to expect that when venire panel members take an oath to answer truthfully all questions put to them in voir dire, they will indeed tell the *whole* truth.

ii.

Second, the district court held Appellant to an incorrect and insurmountable evidentiary standard when it stated, "The record fails to plausibly suggest that [Juror] Treakle deliberately omitted material information in response to questions asked on voir dire." *Porter III*, 2016 WL 1688765, at *11 (internal quotation marks omitted). How could Appellant meet this standard without discovery or a hearing? "[I]t would create a 'classic catch-22' if a [habeas] defendant were obliged to submit admissible evidence to

29

the [district] court in order to be accorded an evidentiary hearing, when the defendant is seeking the hearing because he cannot, without subpoena power or mechanisms of discovery, otherwise secure such evidence." *Conaway*, 453 F.3d at 584. The district court further opined, "Perhaps if [Juror Treakle's brother] had been murdered or shot in the line of duty one could doubt [Juror] Treakle's assurances that he could remain impartial in the trial of [Appellant] for the capital murder of a police officer." *Porter III*, 2016 WL 1688765, *12. But suggesting that bias could only arise if Juror Treakle's brother himself had been a victim not only undermines the district court's own analysis, but it creates an unworkable inquiry that flies in the face of *Williams*, *Smith*, and *Conaway*.

iii.

Third, at the motion to dismiss stage, a district court must "accept a petitioner's well-pleaded allegations as true, and . . . draw all reasonable inferences therefrom in the petitioner's favor." *Conaway*, 453 F.3d at 582. However, here the district court ignored this standard and made assumptions adverse to Appellant about Juror Treakle's answers at voir dire. For example, the district court called Juror Treakle "honest" (twice) and "forthright." *Porter III*, 2016 WL 1688765, at *12–13. He found that Juror Treakle "did not intentionally conceal the fact that he had a brother who was a deputy sheriff." *Id.* at *12. These determinations are not only contrary to the legal standard, but should be properly made *after an evidentiary hearing. See Teleguz v. Zook*, 806 F.3d 803, 811 (4th Cir. 2015) (explaining earlier remand was appropriate for the district court to make credibility determinations at "an evidentiary hearing"). The district court *assumed* Juror

30

Treakle did not purposely lie based on a cold record as opposed to the efficacy of a live hearing. It reasoned, "[Appellant]'s suggestion that [Juror] Treakle volunteered information about his nephew, who was a police officer, but not about his brother, who was a deputy sheriff, for fear of losing his place on the jury suggests a cageyness that is refuted by the record." *Porter III*, 2016 WL 1688765, at \*11. But the "record" to which the district court refers is woefully undeveloped and incomplete. Appellant has not had a chance to develop the record and prove that Juror Treakle, rather than somehow simply forgetting about his brother, purposely omitted or concealed his relationship.

The dissent's logic suffers from the same fatal flaw. It states, "There is no evidence in the record that Treakle was aware of the community's feelings or that he had ever spoken to his brother about the case," and "Pernell's affidavit does not suggest any communication between the brothers." *Post* at 69 n.4. But Appellant was never given a chance to ask Juror Treakle or his brother these crucial questions. Thus, "the dissent ignores a critical component underlying the Supreme Court's concern in cases involving juror bias -- that without a hearing, a criminal defendant is deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation." *Barnes v. Joyner*, 751 F.3d 229, 250 (4th Cir. 2014).

c.

The district court also relied on the general rule that juror testimony may not be used to impeach a verdict. If Juror Treakle is called to the stand in an evidentiary hearing, some of his testimony may be barred by Federal Rule of Evidence 606(b), which provides:

31

During an inquiry into the validity of a verdict . . . , a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict . . . . The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). There are three exceptions to this general rule, however. A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b)(2). The Supreme Court has held, "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during voir dire." *Warger v. Shauers*, 135 S. Ct. 521, 525 (2014). However, the Court also recognized, "[I]f jurors lie in voir dire in a way that conceals bias, juror impartiality is adequately assured by the parties' ability . . . to employ nonjuror evidence even after the verdict is rendered." *Id.* at 529. The Sattler Affidavit, as well as

other nonjuror evidence,[7] is being offered here in order to demonstrate actual bias.

Additionally, after discovery, should Juror Treakle be called to testify in an evidentiary hearing, Appellant ought to be able to ask questions regarding external prejudicial information or "whether any outside influence was improperly brought to bear," *Barnes*, 751 F.3d at 257 (quoting *Tanner v. United States*, 483 U.S. 107, 117 (1987) -- for example, pressure from Appellant's family or from other members of the Chesapeake police. Thus, although Rule 606(b) may prevent certain testimony from being solicited in an evidentiary hearing, it would not preclude Appellant or other jurors from testifying altogether.

d.

Finally, in considering whether Appellant was entitled to a hearing, the district court failed to apply the proper analysis, which is itself a legal error and abuse of discretion. *See United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012) ("A district court abuses its discretion when it . . . fails to consider judicially-recognized factors

---

[7] Juror Treakle's brother submitted an affidavit explaining that he was a law enforcement officer in Chesapeake at the time of the murder. *See* J.A. 1721. Other evidence demonstrates that the victim in this case, Officer Reaves, and his family lived in the Chesapeake area, *see id.* at 1861; Chesapeake was mourning the death of another officer, Michael Saffran, similarly killed in the line of duty, *see id.* at 1858 (local police detective, who attended both Officer Saffran's and Officer Reaves's funerals, stating, "Once you hear an officer has been killed, everyone knows and the ripples run through every law enforcement agency[.]"); some Chesapeake law enforcement officers participated in the manhunt for Appellant when he fled after killing Officer Reaves, *see id.* at 1652, 1851–52; and after her husband's death, Mrs. Reaves wrote a letter in the Virginia Pilot, the local newspaper, stating, "We wish to acknowledge with heartfelt thanks the . . . support during the sudden loss of Officer Stanley C. Reaves. We are so appreciative of the Norfolk and Chesapeake Police Departments . . . ," *id.* at 1861.

33

limiting its discretion . . . ."); *In re Wray*, 433 F.3d 376, 378 n.* (4th Cir. 2005) ("[A]n error of law by a district court is by definition an abuse of discretion."). We have held:

> A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).[8]

*Juniper v. Zook*, 876 F.3d 551, 563 (4th Cir. 2017) (citation omitted); *see also Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002).

First, Appellant "diligently pursued his [actual bias] claim in state court" by raising it as a distinct claim in his petition and requesting a hearing on that claim at least twice, to no avail. *See* J.A. 1651 (August 2009, state habeas petition); 2374 (February 2012, motion for evidentiary hearing in state habeas court). Second, he has alleged facts that, if true, "might well entitle him to relief." *Fullwood*, 290 F.3d at 681. Under *Williams*, a juror's silence about a matter of importance to the trial "could suggest . . . an unwillingness to be forthcoming; this in turn could bear on the veracity of [the juror's] explanation for" nondisclosure, which leads to "the need for an evidentiary hearing." 529 U.S. at 441–42. If, at that hearing, the court determines that Juror Treakle was biased and

---

[8] The *Townsend* factors are: "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 372 U.S. at 313.

unwilling or unable to decide the case "solely on the evidence before [him]," *Smith*, 455 U.S. at 217, then Appellant might well be entitled to relief. *Cf. Conaway*, 453 F.3d at 582, 588, 590 (requiring evidentiary hearing where allegations of juror dishonesty under *McDonough* give rise to inference of bias that would affect fairness of trial).

Finally, the district court did not even mention the *Townsend* factors. Yet Appellant clearly satisfies the fifth *Townsend* factor -- which is "the material facts were not adequately developed" in state court. 372 U.S. at 313; *see also Fullwood*, 290 F.3d at 681 (explaining that § 2254 petitioner met the fifth *Townsend* factor where he "raised troubling allegations" of juror influence "but was not afforded a hearing to develop the issue").

Of course, it is not clear at this stage whether a finding of actual bias is appropriate. What is clear, however, is that the failure of the state habeas court to permit Appellant to adequately develop the facts entitles him to discovery and an evidentiary hearing -- a hearing he requested at multiple junctures, *see* J.A. 1651 (state habeas petition); 2374 (motion for evidentiary hearing in state habeas court on juror issue); 2529, 2534 (evidentiary hearing requested in district court); Brief, *Porter v. Zook*, No. 3:12-cv-550 (E.D. Va. filed Nov. 9, 2015), ECF No. 93 at 9 (request for hearing and discovery in district court after *Porter II* remand).

For these reasons, we hold that the district court erred in dismissing the actual bias claim as matter of law without discovery and a proper hearing. We, therefore, vacate and remand with instructions to provide Appellant this opportunity.

B.

35

*The McDonough Claim*

Appellant's *McDonough* claim meets the same fate. To prove a juror bias claim under *McDonough*, the petitioner must show: (1) "a juror failed to answer honestly a material question on voir dire," and (2) "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. Because the state habeas court addressed this issue on the merits, we review under the deferential AEDPA standard, which requires Appellant to demonstrate that the state habeas court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Even under this deferential standard, the state habeas court unreasonably applied clearly established federal law. Both the state habeas and district courts concluded that Juror Treakle did not fail to "honestly" answer the relevant voir dire question because he does, in fact, have a nephew in law enforcement in Arlington. *See Porter*, 722 S.E.2d at 539 ("Juror T[reakle] answered truthfully that he had a nephew who was an Arlington County Police Officer . . . and . . . he was not asked, nor did he have the opportunity to answer, if he had any additional relationships with law enforcement officers."); J.A. 2819 (Juror Treakle's "failure to advise that he had *additional* relationships with law enforcement officers did not amount to a deliberate omission of material information." (emphasis supplied)). This is an unreasonable application of *McDonough*.

1.

36

In *Conaway v. Polk*, this court addressed a strikingly similar case on § 2254 review. The issue in *Conaway* was whether a juror was biased under *McDonough* for failing to disclose that he was a relative of the key prosecution witness, a man named Harrington, when asked if he knew anyone on the witness list or recognized any names. 453 F.3d at 573. He did, however, acknowledge that he knew another person on the witness list. The trial hinged on a credibility determination between the defendant Conaway and Harrington, and Conaway was convicted of first degree murder and sentenced to death. *See Conaway*, 453 F.3d at 573–75. On the first prong of *McDonough*, we concluded that the state habeas court unreasonably applied clearly established federal law in dismissing the claim. We reasoned that an allegation that the juror "failed to disclose" he was Harrington's relative was "sufficient under *McDonough* to state a constitutional claim for relief." *Conaway*, 453 F.3d at 585. This is true even though that juror swore that nothing would affect his ability to render an impartial verdict. *See id*. Therefore, we have viewed the "honesty" aspect of the first *McDonough* prong as encompassing not just straight lies, but also failures to disclose. The State has offered no principled distinction between Appellant's *McDonough* claim and the one in *Conaway*.

The dissent attempts to distinguish *Conaway* by explaining that in the case at hand, "[t]here are not 'multiple questions' that could 'candidly be answered' only by acknowledging that [Treakle's] brother was a sheriff's deputy." *Post* at 63. But *Conaway*'s holding did not hinge on the fact that counsel asked more than one question; rather, that holding depended on the fact that the juror did not answer truthfully the

37

questions posed to him. Indeed, *McDonough* itself states that the first prong is satisfied if the "juror failed to answer honestly *a* material question on voir dire." *McDonough*, 464 U.S. at 556 (emphasis supplied). Here, the question was straightforward: "Have you, any member of your family or close personal friend worked for or with any law enforcement organization, either as an employee or on a volunteer basis?" J.A. 250–51. Broken down, the question asked was: Has any member of your family worked for a law enforcement organization? The dissent faults counsel for failing to ask a follow up question or a more specific question, *see post* at 63, but that position creates a situation where counsel must necessarily assume that jurors who have taken an oath are, at best, withholding critical information, and at worst, lying. Point blank, Juror Treakle did not candidly answer counsel's question. Appellant is entitled to find out why.

## 2.

We also cannot say as a matter of law that the *McDonough* claim should be dismissed based on the second prong. This prong requires that Appellant would have had a "valid basis for a challenge for cause" of Juror Treakle. *McDonough*, 464 U.S. at 556. Because we cannot surmise which follow up questions (and answers) may have followed from Juror Treakle's correct answer that his brother worked in law enforcement in Chesapeake, we cannot say as matter of law that Appellant would not have had a valid basis to challenge for cause. This is a matter that must be further explored in an evidentiary hearing upon remand.

## C.

In sum, the district court erred in dismissing the actual bias claims in *Porter III*

without discovery and a hearing, and it also erred in *Porter I* by failing to follow *Conaway* and dismissing the *McDonough* claims without a hearing. We vacate and remand so that Appellant, once and for all, may be able to investigate his bias claims.

IV.

*Non-Juror Claims*

Appellant raises a host of other challenges to the state court proceedings and dismissal of the Amended Petition. Except for the defaulted *Martinez* claims, discussed in Part IV.D. *infra*, all of the following claims were adjudicated on the merits in state court, and thus, we are tasked with deciding whether the state habeas court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A.

*Risk Assessment Testimony*

Appellant claims that the state habeas court unreasonably applied clearly established federal law when it denied Appellant the opportunity to present individualized risk assessment testimony as mitigating evidence in the penalty phase of his trial. The district court was correct in rejecting this claim.

Before trial, Appellant moved for the appointment of Dr. Mark Cunningham "as an expert on the assessment of the risk of violence by prison inmates and, in particular, the risk of future dangerousness posed by [Appellant] if incarcerated in a Virginia

39

penitentiary for life." J.A. 66. The expert would have examined Appellant's history and determined the likelihood of violence in a prison setting. The trial court denied the motion, explaining "the Virginia Supreme Court has consistently upheld the denial of use of public funds for such an expert, as it's not considered to be . . . proper mitigation evidence." *Id.* at 206. In addition, the trial court decided that the testimony would not be "particular[ized]" to Appellant but rather, "very general testimony" about prisons and Appellant's likely behavior there. *Id.* at 207. The Supreme Court of Virginia affirmed. Here, Appellant claims that the denial of this expert violated his Fourteenth Amendment right to due process because in a death penalty case, he "must be allowed to present rebuttal evidence." Appellant's Br. 24.[9]

After our remand in *Porter II*, this court decided *Morva v. Zook*, which held on § 2254(d) review that a Virginia state court's decision -- that the defendant, Morva, had no due process right to appointment of a prison risk-assessment expert because he did not make the required particularized showing -- was not contrary to or an unreasonable application of clearly established federal law. *See* 821 F.3d 517, 524–25 (4th Cir. 2016).

*Morva* controls this argument.[10] Quite simply, "the U.S. Supreme Court has never

---

[9] The trial court granted Appellant's request for a mental health expert and a neuropsychological expert.

[10] Appellant contends that *Morva* interpreted the Eighth Amendment risk assessment claim as a Sixth Amendment claim, and that it did not address the Fourteenth Amendment claim. *See* Appellant's Br. 23 n.10. We disagree. Although this court framed the issue as a defendant's right to a state-funded, court-appointed expert, it nonetheless analyzed the issue as an alleged "violat[ion of] [Appellant's] Eighth and Fourteenth Amendment rights." *Morva*, 821 F.3d at 523.

addressed a capital defendant's right to a state-funded nonpsychiatric expert." *Morva*, 821 F.3d at 524. As *Morva* explains, two key cases upon which Appellant relies, *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *Simmons v. South Carolina*, 512 U.S. 154 (1994), are inapposite. In *Skipper*, the Supreme Court held that Skipper, a capital defendant, was entitled to present mitigating evidence to the jury about his good behavior for the seven months he spent in jail awaiting trial. *See* 476 U.S. at 4. And in *Simmons*, the Court held that "[w]here the state puts future dangerousness at issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury . . . that he is parole ineligible." 512 U.S. at 177–78 (O'Connor, J., concurring in the judgment). As we stated in *Morva*, these cases "do not clearly establish a capital defendant's right to a state-funded nonpsychiatric expert." *Morva*, 821 F.3d at 526.

Appellant sought to introduce the same type of evidence as Morva, and indeed, the very same expert, Dr. Cunningham, who would take the defendant's history and place it in a broader context to show his likelihood of future dangerousness. Indeed, Appellant's motion for appointment of Dr. Cunningham describes his use of "context and statistical and actuarial data" to come up with a "determination of risk" of his future dangerousness in prison. J.A. 70. The state court found that Appellant's proffer was not "individualized" or "particularized" to Appellant, and that determination is not unreasonable. *Porter*, 661 S.E.2d at 438. Under Virginia law, "[t]he indigent defendant who seeks the appointment of an expert must show a particularized need." *Husske v. Commonwealth*, 476 S.E.2d 920, 925 (Va. 1996). A defendant is required to show that

41

the expert testimony will "focus . . . on the particular facts of [his] history and background, and the circumstances of his offense." *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001). This standard "has repeatedly been held to be within . . . federal constitutional standard[s]." *Yarbrough v. Johnson*, 490 F. Supp. 2d 694, 720 (E.D. Va. 2007) *aff'd*, 520 F.3d 329, 337 (4th Cir. 2008); *see also Weeks v. Angelone*, 176 F.3d 249, 266 (4th Cir. 1999) ("[T]he *Husske* rule recognizing a federal constitutional right to non-psychiatric experts in Virginia state cases upon a particularized showing of such need adds to an existing guarantee of due process.").

Therefore, the state court did not unreasonably find that Appellant did not make a particularized and individualized proffer for his expert testimony, and it did not violate clearly established federal law in rejecting Appellant's request for the risk assessment expert.[11]

B.

*Ineffective Assistance of Counsel Claims*

Appellant also raises several Sixth Amendment IAC claims. To prevail on such claims, Appellant is required to show "(1) his counsel's performance 'fell below an objective standard of reasonableness' measured by 'prevailing professional norms,' and

---

[11] Appellant also claims that district court "did not address [his] constitutional claims." Appellant's Br. 26. To the contrary, the district court placed Appellant's claim within the purview of the Due Process Clause of the Fourteenth Amendment, as explained by *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) ("Our concern is that the indigent defendant have access to a competent [expert] . . . , and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.").

that counsel's 'deficient performance prejudiced' him." *Christian v. Ballard*, 792 F.3d 427, 443 (4th Cir. 2015) (citation omitted) (quoting *Strickland v. Washington*, 466 U.S. 668 (1984)).

> The court must evaluate the conduct from counsel's perspective at the time, and apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance, in order to eliminate the distorting effects of hindsight. In all cases, the petitioner's burden is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

*Id.* (citations and internal quotation marks omitted). In order to show prejudice, "the petitioner must . . . show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, and the likelihood of a different result must be *substantial*, not just conceivable[.]" *Id.* at 139–40 (citations, alteration, and internal quotation marks omitted) (emphasis in original).

1.

*Did counsel fail to reasonably investigate Officer Reaves's
history of alleged unprofessional conduct?*

After trial, Appellant uncovered incidents of allegedly unprofessional conduct in Officer Reaves's past that Appellant claims should have been discovered by his trial counsel. In 1994, when Officer Reaves was a police officer with Baltimore City, he

43

handled a drug suspect roughly (pushing him and causing him to fall) and slashed his bicycle tires. A fellow officer was so rough with a protesting bystander, a man named Hite (whom he was arresting for disorderly conduct), that Hite ultimately died of head injuries. During the subsequent investigation, an eyewitnesses contradicted Reaves's version of the events, and Reaves stated that he believed his fellow officer acted appropriately. Then, in 2001,[12] Reaves was in his cruiser pursuing a 17 year old who was riding a dirt bike. The 17 year old lost control of his bike, hit a curb, was thrown head first into a utility pole and died of head injuries.

The state habeas court concluded:

> Petitioner acknowledges that counsel was not on notice of Reaves' alleged prior employment history. Petitioner fails to articulate how personnel records relating to Officer Reaves' employment as a Baltimore police officer, which do not show any formal disciplinary proceedings and do not reference any instances of Officer Reaves inappropriately displaying or using his service weapon, would have been relevant in bolstering petitioner's testimony that Officer Reaves forcefully approached petitioner with his gun drawn.

*Porter*, 722 S.E.2d at 549. The district court followed suit, explaining that it was not an unreasonable application of the facts to find that counsel was not on notice of Reaves's employment history. Also, it was not an unreasonable application of the law to hold that counsel was not deficient, where counsel chose to limit his investigatory energy to other areas in light of the trial court's rejection of a self-defense argument. *See Porter I*, 2014 WL 4182677, at *13–14.

---

[12] It appears this incident also occurred when Reaves was employed in Baltimore.

We affirm the district court on this point. Under the deferential AEDPA standard, it was not an unreasonable determination of fact that counsel was not on notice of Reaves's employment history -- Appellant has not rebutted that finding by clear and convincing evidence. On the law, it was not unreasonable to conclude that Appellant did not show deficient performance. Counsel was precluded from arguing that Appellant acted in self-defense, so the fact that counsel did not ask for Reaves's personnel records is not particularly egregious. *See Jordan v. Commonwealth*, 252 S.E.2d 323, 325–26 (Va. 1979) (trial court may refuse to admit evidence of victim's reputation for violence if self-defense is not a viable defense).

2.

*Did trial counsel unreasonably fail to call
exculpatory information to the jury's attention?*

This claim focuses on the trial testimony of Reggie Copeland and Latoria Arrington. Copeland testified that he followed Reaves's cruiser back to Arrington's apartment on foot, and upon approaching the building, he saw "Officer Reaves in the car and [Appellant] was coming out [of] the building." J.A. 541. Appellant claims this contradicts Arrington's testimony that Appellant only exited the building upon seeing Copeland and Reaves talking to each other outside. Indeed, at closing, the prosecution harped on the fact that the women in the apartment "commented on the police arriving" and that prompted Appellant to exit the building. *Id*. at 1167–68. Appellant claims that counsel should have "attack[ed] [Arrington]'s account" with Copeland's testimony. *See* Appellant's Br. 38.

The state habeas court concluded:

> [C]ounsel reasonably chose to pursue a trial strategy of attacking the credibility of the Commonwealth's witnesses, Reggie Copeland and Latoria Arrington. Furthermore, petitioner's own statement established that he saw Officer Reaves on the sidewalk before the shooting, which would support the Commonwealth's argument that petitioner chose to confront Officer Reaves. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that [Appellant was prejudiced].

*Porter*, 722 S.E.2d at 543. The district court decided the state court decision was not unreasonable because counsel chose "to use Copeland's testimony sparingly," while impeaching some of it. *Porter I*, 2014 WL 4182677, at \*19. Also, it found no prejudice because other testimony established that Appellant saw Reaves before he approached him and thus, he chose to confront him rather than to just react to him. *See id.* at \*20.

We affirm on this issue because the state habeas court did not unreasonably apply *Strickland* in concluding that Appellant failed to demonstrate that counsel's performance was deficient. Trial counsel explained in an affidavit that he and co-counsel "made the strategic decision not to argue that Copeland's testimony . . . contradicted [that] of the other women in the apartment" because they "did not believe that Copeland was a credible witness." Exhibit 15 to Application for Habeas Corpus, *Porter I*, No. 3:12-cv-550 (E.D. Va. filed Oct. 9, 2012), ECF No. 22-15 at 6 ¶ 5. This choice certainly does not "f[a]ll below an objective standard of reasonableness." *Christian*, 792 F.3d at 443 (internal quotation marks omitted).

### 3.

*Did counsel fail to reasonably investigate aggravating evidence?*

46

Appellant claims that counsel failed to "meet their duty" to investigate aggravating evidence, even though they were put on notice that the prosecution would present such evidence. Appellant's Br. 40. He claims that counsel:

> never spoke with [Appellant] about the prosecution's evidence until witnesses took the stand; failed to familiarize themselves with documents that would have enabled them to impeach prosecution witnesses and identify rebuttal and mitigating information; and never contacted witnesses identified in [Appellant]'s files who could have provided testimony showing [Appellant] did not pose a future danger to society.

*Id.* at 41 (citing J.A. 1774–58, 1586, 1772–75).

The aggravating evidence introduced by the prosecution included: (1) Appellant's attack on an inmate in 1997; (2) assault of an inmate in 1998; (3) refusing to go to court "without a fight" in 2007; and (4) running away from police into a "stranger's house." *Porter*, 722 S.E.2d at 544–45. Appellant claims that if counsel would have looked into these incidents more, they would have seen that the attacks were in response to aggression by another inmates; in 2007, he refused to go to court because he was to be subjected to an unnecessary strip search; when he fled police, he was fleeing to his own house; and he was known by other inmates as peaceful and good hearted.

The state habeas court concluded, "Petitioner fails to allege how [the details mentioned above] serve[] to mitigate petitioner's actions." *Porter*, 722 S.E.2d at 545. The district court agreed, explaining, "Even assuming that [Appellant's] version of the events in his affidavit were true, . . . there is a low probability that at least one person on the jury would have come to a different decision . . . ." *Porter I*, 2014 WL 4182677, at

47

*33.  We agree and affirm on this issue because the state habeas court did not unreasonably apply *Strickland*.  Even if counsel presented the so-called mitigating evidence, a reasonable juror could conclude that Appellant's actions in each of these instances were still not justified.  Therefore, even if counsel were deficient, the state court was not unreasonable in concluding that Appellant cannot demonstrate prejudice.

4.

*Should counsel have argued for a first-degree murder instruction?*

Appellant believes counsel should have asked for a first-degree murder instruction because the prosecution would have had to prove that Reaves's actions were "within the boundaries of official law enforcement protocols," and Appellant could have "provided jurors the means for finding the prosecution's evidence insufficient on this element." Appellant's Br. 47.

The state habeas court concluded,

> The record . . . demonstrates that counsel made a strategic decision not to request a jury instruction that was not supported by the evidence. [Appellant] testified that he knew there was a warrant out for his arrest, that he knew he was carrying a firearm although he was a convicted felon, and that he saw Officer Reaves in his police uniform.  Although [Appellant] also testified that he was not thinking about the warrant and that he thought Officer Reaves was 'pulling a gun on him,' accepting petitioner's testimony as true, and viewing the evidence in the light most favorable to him, nothing supports a finding that [Appellant] reasonably believed the officer was not engaged in the execution of official duties at the time of the shooting.

*Porter*, 722 S.E.2d at 543.  As for the district court, first, it concluded the state court's finding that "nothing supports a finding that [Appellant] reasonably believed the officer

48

was not engaged in the execution of official duties" was incorrect because at the least, Appellant himself testified that he believed Reaves was not engaging in the execution of official duties. *Porter I*, 2014 WL 4182677, at \*20–21. Nonetheless, the district court did not find unreasonable the state court's finding that Appellant "could not have reasonably believed" that Officer Reaves was not engaged in the execution of official duties. *See id.* at 21. Second, on the law, "[a] defendant is not entitled to a first-degree jury instruction if there is no evidence to support it." *Id.* (citing *Pruett v. Thompson*, 996 F.2d 1560, 1564 (4th Cir. 1993)).

It was not an unreasonable determination of fact for the state habeas court to discredit Appellant's testimony that he actually believed Reaves to be acting outside of his official capacity. Further, the state court did not unreasonably conclude that, even if counsel were deficient in failing to argue for this instruction, Appellant did not demonstrate the outcome of his trial would have been different. As the state court explained, "central to petitioner's defense was counsel's argument that petitioner did not premeditate his action. Therefore, a first-degree murder instruction, which would necessarily include the element of premeditation, would have been inconsistent" with this theory. *Porter*, 722 S.E.2d at 543. And even though Appellant argues that he could negate the mens rea of the first-degree murder instruction, the trial court held that Appellant could not make out a case of self-defense. *See* J.A. 1143 ("I don't believe you're entitled to a self-defense instruction as it's set forth in the facts of this case. I'm going to refuse this instruction."). We affirm on this issue as well.

C.

49

*Brady v. Maryland Claim*

Based on the information recounted above regarding Officer Reaves's allegedly unprofessional conduct, Appellant contends that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Officer Reaves had a history of acting unprofessionally during the course of his employment. To establish a violation of *Brady*, a defendant must show "(1) that the undisclosed information was favorable, either because it was exculpatory or because it was impeaching; (2) that the information was material; and (3) that the prosecution knew about the evidence and failed to disclose it." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).

The state habeas court rejected these *Brady* claims, explaining that this evidence was not known to the Commonwealth at the time of trial. *See Porter*, 722 S.E.2d at 541. The court reasoned:

> The record, including a 2009 Freedom of Information Act response from the Assistant City Attorney for the City of Norfolk and the affidavit of Philip Evans II, Deputy Commonwealth's Attorney for the City of Norfolk, demonstrates that the Commonwealth did not possess any information concerning the 1994 or 2001 incidents. Furthermore, pursuant to *Brady*, there is no obligation to produce information available to the defendant from other sources, including diligent investigation by the defense.

*Id.* (citing *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002); *Cherrix v. Commonwealth*, 513 S.E.2d 642, 649 (Va. 1999)). Appellant claims this conclusion contains both an unreasonable determination of the facts under § 2254(d)(1) because Appellant could not have obtained these records even with diligent investigation, and an unreasonable application of federal law under § 2254(d)(2).

50

"The burden of proof [of a *Brady* violation] rests with [Appellant]." *United States v. King*, 628 F.3d 693, 701–02 (4th Cir. 2011). Although "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and "police knowledge is plainly imputed to the prosecution for purposes of the prosecutor's *Brady* duties," *Jean v. Collins*, 221 F.3d 656, 661 (4th Cir. 2000), in this case, Appellant has not shown that this "favorable evidence" of Reaves's background was ever *possessed* by Norfolk police or the state. Indeed, during Officer Reaves's own deposition testimony as part of the Hite litigation, which was presented to the state habeas court, Reaves testified that although there was an investigation into the incident, "[n]obody really formally told [him] anything yet" about the results; he never received paperwork about it; and although he was removed from street duty, he did not indicate whether that action was captured in his personnel file. J.A. 2010–12. And Appellant likewise points to no other evidence that the 2001 incident was memorialized in such a way.

Moreover, Appellant conceded in the district court that "[a] reasonable investigation [by his trial counsel] would have identified Reaves as the primary actor" in the bike incident, and the "Hite incident was a matter of public record and garnered significant publicity." J.A. 2559. This severely undermines his argument that the state court unreasonably found facts under § 2254(d)(1), because it is clear Appellant could have obtained these records with diligent investigation. For these reasons, we reject the *Brady* argument in Claim II of the Amended Petition.

D.

51

*Appellant's Martinez Claims*

Finally, Appellant, with new counsel, raises arguments with regard to three defaulted claims (Claims XV, XVI, and XVII) pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012) ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."). These claims are: (1) counsel failed to object to improper curative instructions and comments during closing arguments; (2) the district court denied discovery on the claims that counsel failed to investigate Reaves's misconduct; and (3) the prosecution violated *Brady* when it failed to disclose a quid pro quo between the Commonwealth and Valorie Arrington. To invoke *Martinez*, Appellant must demonstrate that state habeas counsel was ineffective or absent, and that the underlying IAC claim is substantial. *See Martinez*, 132 S. Ct. at 1318; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). None of these claims meet these requirements.[13]

---

[13] The third claim mentioned above (the quid pro quo claim), although characterized in Petitioner's brief as a *Martinez* claim, is more appropriately characterized as a defaulted *Brady* claim. In any event, Petitioner has not demonstrated cause and prejudice to excuse the default. *See Juniper v. Zook*, 876 F.3d 551, 564–65 & n.6 (4th Cir. 2017).

Therefore, we decline to consider the *Martinez* claims.[14]

V.

For the foregoing reasons, we affirm the district court's dismissal of Appellant's § 2254 petition, except for Claim I. We vacate the district court's decision on the juror bias claims set forth in Claim I of the Amended Petition and remand with instructions that the district court conduct discovery and an evidentiary hearing in resolving those claims.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

---

[14] Appellant raised six issues in his first appeal that are not raised in this appeal. First, "The district court repeatedly began its § 2254(d)(2) analysis by improperly applying § 2254(e)(1)'s presumption of correctness to the state's courts determination of facts in the state court record." Appellant's Br. 5, *Porter v. Zook*, No. 14–5 (4th Cir. filed March 9, 2015). In this appeal, Appellant interwove this argument with some of the substantive issues. Second, the *Strickland* claims were improperly addressed because they were not analyzed cumulatively. Third, trial counsel was ineffective in failing to request that Reaves's holster be tested for fingerprints (Claim IV). Fourth, prosecutors violated *Brady* and *Napue* in withholding allegedly conflicting testimony by Simone Coleman (Claim III). Fifth, counsel failed to investigate prison conditions and Appellant's adaptability to prison (Claim X). Sixth, counsel failed to investigate allegations of Appellant's abuse by his mother and other relatives for mitigation purposes at sentencing (Claim VIII). We have reviewed each of these arguments and find no error. We also note that Petitioner has not challenged, in either appeal, the district court's dismissal of Claims XII, XIII, and XIV.

SHEDD, Senior Circuit Judge, concurring in part and dissenting in part:

The majority grants Thomas Porter his request for discovery and an evidentiary hearing on his claims of juror bias. In my view, Porter's claim for dishonesty during voir dire was examined and rejected by the Supreme Court of Virginia, and that determination is not an unreasonable application of federal law. Moreover, even assuming his actual bias claim was not adjudicated on the merits by the Supreme Court, it is without merit. Accordingly, I would affirm the district court's dismissal of Porter's 28 U.S.C. § 2254 petition in full. I therefore dissent from Part III of the majority opinion.[1]

I.

I begin by recounting the facts pertinent to Porter's juror bias claims, claims that hinge on the actions of a single juror, Bruce Treakle. Initially, there is no doubt as to Porter's guilt: he murdered Officer Stanley Reaves in Norfolk. Due to the publicity surrounding the murder, Porter's trial was moved from Norfolk to Arlington County in northern Virginia. At the beginning of voir dire, the circuit judge informed the potential jurors that the case was moved from Norfolk because of "publicity" (J.A. 222), and that the case involved "a charge of capital murder of a law enforcement officer." (J.A. 223). The judge also told the jurors that the law enforcement officer was "a Norfolk police officer," (J.A. 227), and the jurors assured the judge that they had not seen or heard "anything about this case either today or any other time," (J.A. 228).

---

[1] I concur in the remainder of the majority opinion, which affirms the dismissal of Porter's other claims.

During voir dire, Porter's attorney, Joseph Migliozzi, first asked jurors if they "belonged to any organizations" that "support[] law enforcement objectives in your community." (J.A. 248). He then pivoted to a "little more specific question," that is, "[h]ave you, any member of your family or close personal friend worked for or with any law enforcement organization, either as an employee or on a volunteer basis." (J.A. 250-51). Migliozzi noted that several jurors had already provided an answer to that question in response to his first question and clarified what he was asking: "But is anyone here, or a member of your close personal family, worked in law enforcement in any capacity as a volunteer or an employee?" (J.A. 251). This question prompted the following exchange:

MR. MIGLIOZZI: I'm going to start in the back row. Mr. Treakle.

MR. TREAKLE: My nephew is an Arlington County police officer.

MR. MIGLIOZZI: Your nephew?

MR. TREAKLE: Yes.

MR. MIGLIOZZI: In this county here?

MR. TREAKLE: Yes.

MR. MIGLIOZZI: Do you think, with that being the case, that that would impair your ability to sit on this jury and render a fair and impartial verdict in this case?

MR. TREAKLE: No.

(J.A. 251-52).

Multiple jurors answered that they had a relative in law enforcement; all stated that they could remain impartial, and counsel did not move to strike any juror for cause on this

basis. Despite the publicity the case had generated in the Norfolk area, Migliozzi did not ask the jurors if they had any family or friends in Norfolk.

After conducting voir dire with the full panel, the circuit judge placed the venire into groups of four to probe their ability to sit impartially on a capital case involving a police officer's murder. During the small group questioning, Migliozzi reminded Treakle that the case involved the capital murder of a police officer and asked, "If you should convict, the defendant, Mr. Porter, of capital murder, could you follow the Court's instructions and consider voting for a sentence of less than the death penalty?" (J.A. 318). Treakle responded, "Yes." (J.A. 318). Migliozzi probed the jurors' ability to weigh testimony from law enforcement officers, asking "[d]o you believe that the testimony of a law enforcement official, a police officer, is more believable than the testimony of another witness just because he or she is a law enforcement officer?" (J.A. 316). Treakle shook his head no. Finally, Treakle and the other venire persons in his small group were asked, "[D]o any of the four of you know of any reason why you could not or would not be able to fairly and impartially determine the facts of the case or abide by the instructions of the Court on the sentencing issues?" (J.A. 316). All four jurors responded in the negative.

Treakle was seated on Porter's jury, and Porter was convicted of Reaves' murder and sentenced to death. After the Supreme Court of Virginia affirmed Porter's conviction and sentence, Porter pursued his state collateral review. As part of the investigation into any potential claims, Porter's habeas counsel, Dawn Davison, had a law student, Maryl

Sattler, assist in interviewing jurors. The law student summarized the interview with Treakle as follows:

> Ms. Davison . . . explained to Mr. Treakle that we were there representing Thomas Porter, and that we were interviewing jurors as part of our review of the entire case. Mr. Treakle indicated that he understood and was willing to speak with us. He explained that he had to pick up his wife at 3:00 pm, so he would only be available for a few minutes.
>
> Ms. Davison asked Mr. Treakle which of the witnesses made the greatest impression on him during the trial. Without hesitation, Mr. Treakle replied that he found the officer's wife (Treva Reaves) to be a very powerful witness. He indicated that he found her testimony moving and very emotional for him because his brother is a sheriff's officer in Norfolk. We were very surprised by this statement because we had read his voir dire prior to the interview and Mr. Treakle had never said anything about this brother. When Ms. Davison asked for clarification, Mr. Treakle repeated that his brother works for the sheriff's department "down in Norfolk." Mr. Treakle said sitting through Mrs. Reaves's testimony had been difficult for him. He expressed sympathy for law enforcement officers, and emphasized that they put their lives on the line every day for the community.
>
> We only spoke with Mr. Treakle for a short while. At approximately 2:45 pm, Mr. Treakle said that he wished he could speak with us longer, but he did not want to be late to pick his wife up from work at 3:00 pm. We thanked him for his time and left his home.

(J.A. 1719) (the Sattler affidavit). According to Sattler, Treakle was "warm and collegial," and he was not asked to sign an affidavit during their discussion. (J.A. 1720).

After speaking to Treakle, Porter obtained an affidavit from Treakle's brother, Pernell, confirming that since 2000 he has been a deputy sheriff in Chesapeake, the

57

neighboring jurisdiction to Norfolk.[2] Neither affidavit suggests that Treakle and his brother spoke before or during the trial or have ever spoken about Porter's case. Porter also submitted an affidavit from an alternate juror noting that he was "surprised to learn that some jurors had close family members who were law enforcement officers," and that he was "shocked when one juror said that he had a brother who was a law enforcement officer." (J.A. 1722). Porter did not provide any affidavits suggesting that Treakle exerted any pressure on jurors because of his brother's occupation or that Treakle informed any jurors that his brother lived in Chesapeake.

In his state habeas petition, Porter argued that Treakle provided materially misleading statements during voir dire and was actually biased against him. The Supreme Court of Virginia denied the claim. The court rejected the voir dire claim on the merits, concluding that Treakle "answered truthfully that he had a nephew who was [a police officer in Arlington], Arlington County being the jurisdiction where the case was being tried . . . and that he was not asked, nor did he have the opportunity to answer, if he had

---

[2] In state habeas proceedings, Porter contended that Pernell's job was "transporting prisoners in the custody of the Department of Corrections." (J.A. 1652). In Chesapeake, the Police Department "is responsible for the prevention and detection of crime, the apprehension of criminals, the safeguard of life and property, the preservation of peace and the enforcement of state and local laws, regulations, and ordinances" in the jurisdiction. Va. Code § 15.2-1704(A). Pernell's employer, the Chesapeake Sheriff's Department, is primarily responsible for operating the city jail and assisting with judicial process. Va. Code. § 15.2-1609. *See also* Virginia Sheriff's Association, *Sheriffs' Offices Responsibilities*, https://vasheriff.org/sheriffs-resources/sheriffs-offices-responsibilities/ (last visited July 12, 2018) (saved as ECF attachment) (noting that City of Chesapeake Sheriff is responsible for civil process, court security, and local jail operation but not for law enforcement).

any additional relationships with law enforcement officers." *Porter v. Warden*, 722 S.E.2d 534, 539 (Va. 2012).

Although the Supreme Court did not address whether Treakle was actually biased, it did review a claim that Porter's attorney was ineffective for failing to uncover Treakle's alleged bias. Specifically, Porter claimed that "he was denied the effective assistance of counsel because counsel failed to raise the claim that [Treakle] was biased due to his brother's employment as a law enforcement officer at trial and on direct appeal." *Id.* at 549. The court rejected this claim, noting it satisfied neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984):

> The record, including the trial transcript and the September 8, 2009 affidavit of counsel, demonstrates that counsel did not know that [Treakle] had a brother in law enforcement. More importantly, *petitioner has provided no admissible evidence that [Treakle] was biased against petitioner* as a result of his brother's employment. Petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter v. Warden*, 722 S.E.2d at 549 (emphasis added).

Porter next filed a § 2254 petition, renewing his claims of juror bias. The district court first rejected the claim that Treakle was dishonest during voir dire. The court found that Treakle's "failure to advise that he had additional relationships . . . did not amount to a deliberate omission of material information." *Porter v. Davis*, No. 3:12-cv-550, 2014 WL 4182677, at *11 (E.D.Va. Aug. 21, 2014) ("*Porter I*"). Even assuming otherwise, the court explained, Porter still could not show that he was prejudiced because he could

59

not show that a correct answer would have given rise to a valid basis to challenge Treakle for cause. *Id.* at \*11-12. The district court did not specifically address any claim for actual bias.

On Porter's prior appeal, we concluded that the district court failed to address Porter's actual bias claim and that, "[b]ecause the district court did not resolve [the actual bias] claim, its decision was not a final order over which we have jurisdiction." *Porter v. Zook*, 803 F.3d 694, 695 (4th Cir. 2015) ("*Porter II*"). After the remand, the district court requested briefing on the actual bias claim alone. The court then granted the State's motion to dismiss. *Porter v. Zook*, No. 3:12-cv-550, 2016 WL 1688765 (E.D. Va. Apr. 25, 2016) ("*Porter III*"). The court first determined that the Supreme Court of Virginia adjudicated the actual bias claim when, in the course of reviewing Porter's related ineffective assistance claim, the Supreme Court concluded that Porter had produced no admissible evidence of bias. *Id.* at \*7. The court next found that Porter's actual bias claim concerned intrinsic rather than extrinsic bias, *id.* at \*9-10, and that Porter "has failed to substantiate his claim with competent evidence that tends to show Bruce Treakle was biased," *id.* at \*13. The court also noted that, even assuming that the Supreme Court of Virginia did not adjudicate Porter's claim, "under a *de novo* standard of review, no relief is warranted because Treakle's innocuous statements [in the Sattler affidavit] do not indicate that he was biased." *Id*. In the court's view, Treakle's statements at most amounted to a generally favorable view of law enforcement, not actual bias.

The majority now concludes that the district court erred in dismissing the actual bias and voir dire claims without an evidentiary hearing. I address each ruling in turn.

60

II.

Because the state habeas court adjudicated the voir dire claim on the merits, "a federal court may not grant habeas relief unless the adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015) (quoting 28 U.S.C. § 2254(d)). The Supreme Court has consistently reminded us that this standard is "difficult to meet and highly deferential," and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted). Importantly, "an *unreasonable* application of federal law differs from an *incorrect* application of federal law." *Jones*, 783 F.3d at 991 (emphasis in original).

We apply the two-prong test from *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) in weighing claims of juror dishonesty during voir dire. Under *McDonough*:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. . . . [O]nly those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556. The test applies "equally to deliberate concealment and to innocent non-disclosure." *Conner v. Polk*, 407 F.3d 198, 205 (4th Cir. 2005). "[T]he bar for juror misconduct" under *McDonough* "is set high." *Porter II*, 803 F.3d at 697.

61

To show a "valid basis" for a challenge for cause, a party must show the juror's "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). This showing is satisfied if (1) a court "demonstrate[d] a clear disregard for the actual bias" of the juror or (2) "a per se rule of disqualification applies" such that bias should be implied. *United States v. Fulks*, 454 F.3d 410, 432 (4th Cir. 2006). "[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). Examples include employer/employee relationships, close relatives involved in the litigation, and a witness to (or individual somehow involved in) the criminal transaction. *Fitzgerald v. Greene*, 150 F.3d 357, 364 (4th Cir. 1998).

In concluding that the state habeas court unreasonably applied *McDonough*, the majority relies on *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006). The facts of *Conaway*, however, are far removed from those of this case. In *Conaway*, a juror was asked whether he knew any of the State's witnesses. The juror answered that he knew the local sheriff. The juror then responded in the negative when asked if he had any family or friends who had interacted with the District Attorney's office. In reality, the juror was a cousin of a co-defendant who happened to be the State's primary witness. We concluded that there were "multiple questions posed to [the juror] that could candidly be answered only by

62

acknowledging his kinsman," and that the state court was unreasonable to find otherwise. *Id.* at 585.

Here, in contrast, after being informed that the case was about the murder of a police officer, Treakle answered that he had a close family member in law enforcement: a nephew serving as a police officer in the very jurisdiction the case was being tried. After affirming that his nephew's occupation would not affect his ability to be impartial, counsel moved on to other jurors without asking follow-up questions. There are not "multiple questions" that could "candidly be answered" only by acknowledging that his brother was a sheriff's deputy.

"*McDonough* provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask." *Billings v. Polk*, 441 F.3d 238, 245 (4th Cir. 2006). Porter's attorney asked only if "anyone here" or "a member of your close personal family" was in law enforcement. He did not ask the jurors to name every family member in law enforcement and he did not follow up with Treakle to ask if any other members of his family were in law enforcement. As we previously acknowledged, "a juror's failure to elaborate on a response that is factually correct but less than comprehensive may not meet [*McDonough*] where no follow-up question is asked." *Porter II*, 803 F.3d at 697. Porter's attorney asked if a member of a juror's family was in law enforcement, and Treakle answered truthfully that a member of his family was a police officer in the jurisdiction where the case was being tried. Treakle's answer is not

"misleading, disingenuously technical, or otherwise indicative of an unwillingness to be forthcoming." *Billings,* 441 F.3d at 245 n. 2.

The facts of this case are akin to *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011). In *Benabe*, the defendants were members of the Insane Deuces gang. During voir dire, Juror 79 answered affirmatively when asked if she had any friends or relatives involved in gangs. No follow-up question was posed, but during the trial the jury foreperson informed the trial judge that Juror 79 told her that her son had been a member of the Insane Deuces for two years. *Id.* at 780. The Seventh Circuit determined that Juror 79 was not dishonest during voir dire; while confessing that the court's "eyebrows went up" when first confronted with Juror 79's son, the court explained that Juror 79 "answered correctly during voir dire that her son had been involved in a gang," and that "nobody asked her" which gang. *Id.* at 781. Defense counsel "did not ask any follow-up questions," and, in light of this failure, the defendants "lost their ability to seek a new trial on this basis." *Id. See also Marquez v. City of Albuquerque*, 399 F.3d 1216, 1224 (10th Cir. 2005) (rejecting *McDonough* claim where counsel "asked the juror only about her participation in dog training and never about her knowledge of dog training;" the juror's "specialized knowledge" was not uncovered during voir dire because counsel failed "to fully examine the juror," not because of "any misrepresentation by the juror"). Like *Benabe*, in my opinion, the failure to uncover Treakle's brother's occupation and residency stems from Porter's counsel's failure to ask a follow-up question.

Moreover, even assuming we believe Treakle should have listed every family member with ties to law enforcement, it certainly is not "unreasonable *under Supreme*

64

*Court precedent*" to conclude, as did the state habeas court, that Treakle did not fail to answer the question honestly. *Billings,* 441 F.3d at 247 (emphasis in original). After all, "an *unreasonable* application of federal law differs from an *incorrect* application of federal law." *Jones*, 783 F.3d at 991 (emphasis in original).

In addition, even assuming Porter has satisfied the first prong of *McDonough*, he cannot show that a correct answer would have given rise to a valid challenge for cause. Pernell Treakle's occupation as a deputy sheriff would not provide a basis for finding implied bias. Implied bias has been limited to "exceptional and extraordinary situations," such as familial relationship with a trial participant, being an employee of the prosecuting agency, or being involved in the charged crime. *Fitzgerald*, 150 F.3d at 365 (internal quotation marks omitted). We have thus rejected its application where a juror inadvertently failed to disclose her husband's murder in a capital murder case, *Fulks*, 454 F.3d at 432-33, and where a juror withheld her belief that her son had been murdered, *Gardner v. Ozmint*, 511 F.3d 420, 424-25 (4th Cir. 2007). Regarding ties to law enforcement, in *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990), we rejected a challenge to the district court's refusal to strike three jurors with such ties, including one whose husband was an FBI agent because it was "consistent" with "case law that refuses to establish a per se rule excluding any person who has had an association with an investigatory agency." *See also United States v. Umana*, 750 F.3d 320, 342 (4th Cir. 2014) ("A juror's generally favorable impression of law enforcement does not necessarily amount to bias any more than does a juror's personal association

65

with law enforcement."). It is clear that Pernell Treakle's occupation does not create a per se rule of disqualification.

Likewise, there is no showing that a truthful answer would yield a finding of actual bias *during* the voir dire. Treakle admitted to having a close family member in law enforcement and affirmed that the relationship would not impact his ability to be impartial. As the voir dire continued, Treakle affirmed on multiple occasions that the fact that the case involved the murder of a police officer would not affect his ability to be impartial. There is no evidence that Treakle was anything less than truthful when he answered these questions.

The majority addresses the second *McDonough* prong by positing that it "cannot surmise which follow up questions (and answers) may have followed" from Treakle mentioning his brother's employment. (Majority Op. at 38). In my view, we can; counsel asked the same follow-up question to each juror with ties to law enforcement, and Treakle repeatedly stated that he could be impartial in this case. As the district court aptly explained:

> Although Porter now suggests that exploring the nuances of each venire person's relationships with, and any empathy for, law enforcement officials was critical to assessing whether a juror could remain impartial, the contemporaneous voir dire suggests otherwise. . . . [T]he attorneys trying the case and who were most familiar with the facts were content with a general reassurance from the venire person that any relationship he or she had with law enforcement officials would not impair his or her ability to render a fair and impartial verdict[.]

*Porter III*, 2016 WL 1688765, at *2. Porter's current counsel is of the belief that ties to law enforcement and the Norfolk area should have been red flags to sitting a juror;

Porter's trial counsel did not—asking only a general follow-up about impartiality and failing to inquire into ties to Norfolk.

The majority concludes that the district court committed reversible error in dismissing Porter's *McDonough* claim and remands the case for discovery and an evidentiary hearing. Given the way in which the majority reaches this conclusion, I am left to wonder, "What is left to consider?" *United States v. Blackledge*, 751 F.3d 188, 214 (4th Cir. 2014) (Shedd, J., dissenting). In reversing the district court's dismissal of the *McDonough* claim, the majority necessarily concludes not that Treakle might have been dishonest at voir dire, or that there is a factual disagreement about his honesty, but that it was unreasonable as a matter of clearly established federal law to conclude that he was honest. Presumably, regardless of Treakle's testimony at a future evidentiary hearing regarding his answers at voir dire, the district court cannot find him credible. On the second prong of *McDonough*, the majority remands because it cannot speculate as to what questions would have emerged had Treakle mentioned his brother. Is the district court also supposed to speculate? Is Porter's trial counsel going to testify? Will his testimony be anything other than self-serving in favor of Porter? I believe the district court correctly determined that the Supreme Court of Virginia did not unreasonably apply clearly established law, and I would affirm dismissal of the *McDonough* claim.

III. Actual Bias

The majority, applying a de novo standard of review,[3] also remands Porter's actual bias claim for further proceedings, including discovery and an evidentiary hearing. In contrast to the majority, I believe the district court correctly denied an evidentiary hearing because Porter "had ample opportunity at voir dire to discover" further information about Treakle's alleged bias. *Billings*, 441 F.3d at 245.

In *Smith v. Phillips*, 455 U.S. 209, 215 (1982), the Court stated that it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith*, however, "does not mean that a court is obliged to hold an evidentiary hearing any time that a defendant alleges juror bias, regardless of whether he utilized the pre-trial procedures available for ensuring the jury's impartiality." *Billings*, 441 F.3d at 245-46. After all, a juror's dishonesty during voir dire "is the best initial indicator of whether the juror in fact was impartial." *McDonough*, 464 U.S. at 556 (Blackmun, J., concurring). Granting a hearing even in situations where trial counsel failed to adequately conduct voir dire would let defendants "sandbag the courts by accepting jurors onto the panel without exploring on voir dire their possible sources of bias and then, if their gambit failed and they were convicted, challenging their convictions by means of post-trial evidentiary hearings based on newly discovered evidence of possible juror bias." *Billings*, 441 F.3d at 246.

---

[3] For purposes of my opinion, I will assume (without deciding) that the Supreme Court of Virginia did not "adjudicate[]" Porter's actual bias claim within the meaning of 28 U.S.C. § 2254(d).

Thus, as we noted in *Billings*, evidentiary hearings are appropriate where the potential biases were not discoverable during voir dire, either because the juror deliberately omits material information or because the potential bias is the result of a later-occurring external influence. *Id.* at 246 n.4. As discussed *supra*, Treakle was not dishonest during voir dire, and there is simply no credible allegation of an external influence.[4] Porter's "evidence," including the Sattler affidavit, at most suggests a preexisting juror bias, but *Smith's* rule in favor of evidentiary hearings "applies only to prejudicial extraneous contacts, not to preexisting juror bias." *Benabe*, 654 F.3d at 780; *Robinson v. Polk*, 438 F.3d 350, 363-64 (4th Cir. 2006) (emphasizing the importance of distinguishing between internal and external influences upon a jury). Instead, "[a] post-verdict inquiry into intrinsic juror influences is almost never justified." *Benabe*, 654 F.3d at 780 (citing Fed. R. Evid. 606(b); *Marquez*, 399 F.3d at 1223 ("A juror's personal experience . . . does not constitute extraneous prejudicial information.")). "The tool for examining an intrinsic influence like juror bias . . . is a voir dire." *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998). *See also McDonough*, 464 U.S. at 554

---

[4] The majority adopts Porter's "evidence" that the areas of Norfolk and Chesapeake were deeply affected by the death of Reeves and a Chesapeake police officer, Michael Saffran. I do not doubt this fact, only the inferences drawn from it—namely, that Treakle was biased against Porter because of his brother's occupation and residence. There is no evidence in the record that Treakle was aware of the community's feelings or that he had ever spoken to his brother about the case. Treakle stated during voir dire that he had not heard about the case, and Pernell's affidavit does not suggest any communication between the brothers.

("Voir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors.").

Moreover, in my view any hearing would be futile. Apart from the claim of dishonesty during voir dire, Porter's claim of actual bias also relies on the allegation from the Sattler affidavit that Bruce Treakle was "moved" by testimony from Office Reeves's widow. This "innocuous statement[] do[es] not indicate that he was biased." *Porter III*, 2016 WL 1688765, at *13, because every piece of evidence is meant to be moving to a juror; after all, we do not expect them "to come into the juror box and leave behind all that their human experience has taught them," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (1994) (O'Connor, J., concurring) (internal quotation marks omitted). What if Bruce Treakle was recently widowed and told Sattler that Mrs. Reaves' testimony was moving precisely because he, too, was adjusting to life as a single parent? Or if another juror was moved by the testimony of Valorie Arrington (who Porter terrorized before murdering Officer Reeves) because of their experience living in a low-income housing complex? The Commonwealth put forth Mrs. Reaves' testimony precisely because it hoped that it would be moving to the jury. The fact that it was successful is not, in my view, evidence of bias.

Moreover, and more importantly, Treakle's statement is barred by Federal Rule of Evidence 606(b)(1), which prohibits a juror from testifying "[d]uring an inquiry into the validity of a verdict," about "the effect of anything on that juror's . . . vote" or "any juror's mental processes concerning the verdict or indictment." The Rule permits a juror to testify if "extraneous prejudicial information was improperly brought to the jury's

attention;" or if "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(A,B). "Jurors' personal experiences do not constitute extraneous information; it is unavoidable they will bring such innate experiences into the jury room." *Warger v. Shauers*, 721 F.3d 606, 611 (8th Cir. 2013), *aff'd* 135 S.Ct. 521 (2014). *Cf. Robinson*, 438 F.3d at 363 (4th Cir. 2006) (noting as internal an influence that merely "invites the listener to examine his or her own conscience from within"). Rule 606(b) extends to testimony suggesting that a juror was dishonest during voir dire. *Warger v. Shauers*, 135 S.Ct. 521, 525 (2014). Applying Rule 606(b), the alternate juror's affidavit would be inadmissible in any evidentiary hearing, as would Treakle's comments referenced in the Sattler affidavit. The fact of Treakle's brother's occupation and the impact of Mrs. Reaves' testimony on Treakle are both "'internal' matters subject to exclusion under Rule 606(b)." *Id.* at 530.

Ultimately, my determination that the failure to uncover Treakle's brother's occupation lies at the feet of Porter's counsel rather than Treakle undermines the request for an evidentiary hearing on the actual bias claim. Apart from the alleged dishonesty at voir dire, the actual bias claim rests on evidence that, in my view, is either barred by Rule 606(b) or does not suggest improper juror bias.

IV.

For the foregoing reasons, I would affirm the dismissal of Porter's § 2254 petition in full.

71